EXHIBIT A

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
W31 MOBILE, LLC, a Minnesota limited liability company

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
DANITA DELGADO, individually and on behalf of a class of similarly situated individuals

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

SEP 16 2008

John A. Clarke, Executive Officer/Clerk

BY SHAUNYA WESLEY, Deputy

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Los Angeles Superior Court Central Division
111 N. Hill Street
Los Angeles CA 90012

CASE NUMBER:
*(Número del Caso):* BC398228

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Alan Himmelfarb, KAMBEREDELSON LLC,
2757 Leonis Blvd., Los Angeles, CA 90058, (323) 585-8696

DATE: SEP 16 2008  Clerk, by S. WESLEY , Deputy
*(Fecha)* *(Secretario)* *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*
   under: ☐ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)    ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
American LegalNet, Inc. | www.USCourtForms.com

Ex A

11

```
ALAN HIMMELFARB (BAR NO. 90480)
KAMBEREDELSON, LLC
2757 Leonis Boulevard
Vernon, California 90058
Telephone: (323) 585-8696

Attorneys for Plaintiff
```

**FILED**
LOS ANGELES SUPERIOR COURT
SEP 1 6 2008
JOHN A. CLARKE, CLERK
BY SHAUNYA WESLEY, DEPUTY

### SUPERIOR COURT OF THE STATE OF CALIFORNIA
### FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| DANITA DELGADO, individually and on behalf of a class of similarly situated individuals,<br><br>   Plaintiff,<br><br>v.<br><br>W3I MOBILE, LLC, a Minnesota limited liability company,<br><br>   Defendant. | Case No.  BC398228<br><br>CLASS ACTION COMPLAINT FOR:<br><br>(1) Unjust Enrichment;<br>(2) Tortious Interference with a Contract;<br>(3) Violation of Cal. Civ. Code § 1770; and<br>(4) Violation of Cal. Bus. & Prof. Code § 17200.<br><br>DEMAND FOR JURY TRIAL<br><br>**CLASS ACTION** |

### CLASS ACTION COMPLAINT

Plaintiff Danita Delgado brings this class action complaint against Defendant W3i Mobile, LLC seeking redress for Defendant's unlawful practice of charging cellular telephone customers for certain products and services the customers have not authorized. Plaintiff, for her class action complaint, alleges as follows upon personal knowledge as to herself and her own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by her attorneys.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Ex A
12

## PARTIES

1. Plaintiff Danita Delgado is a resident of Los Angeles County, California.

2. Defendant W3i Mobile, LLC, d/b/a W3i, a/k/a W3i Holdings, LLC, f/k/a Freeze Mobile, LLC, Ringtone, LLC ("W3i") is a marketer and provider of mobile content in the United States. W3i is a Minnesota limited liability company with its headquarters and principal place of business in the State of Minnesota. W3i does business throughout the State of California and this County.

## JURISDICTION

3. This Court has jurisdiction over the causes of action asserted herein pursuant to the California Constitution, Article VI, §10, because this case is a cause not given by statute to other trial courts.

4. This Court has jurisdiction because Plaintiff resides in this county.

## VENUE

5. Venue is proper in this Court pursuant to Code of Civil Procedure because the cause of action arose here.

## CONDUCT COMPLAINED OF

6. This case arises from two closely related phenomena. The first is the capability of most cellular telephones, not only to make and receive telephone calls, but also to send and receive text messages, including—most significantly for present purposes— "premium" text message services. These services, also known as "mobile content" include products that range from the basic (customized ringtones for use with cell phones, sports score reports, weather alerts, stock tips, horoscope services, and the like) to those requiring more advanced capabilities (such as direct payment services, interactive radio and participatory television).

7. The second underlying phenomenon of this case constitutes its very core. That is, just as providers of premium mobile content deliver their products by means of cell phone technology, they likewise charge and collect payment from their customers by

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

"piggybacking" on the cell phone bills sent out by the wireless carriers. Further, because the mobile content providers by themselves most often lack the wherewithal to negotiate the necessary relationships with the much larger wireless carriers, they do so with the help of third-party companies known as aggregators. These aggregators act as middle-men, representing numerous mobile content providers in arriving at the agreements that allow them to use the billing and collection mechanisms of the wireless carriers. In turn, both the aggregators and the wireless carriers are compensated for their services to the mobile content providers by retaining a substantial percentage of the amount each premium mobile content transaction.

8.   The rapid and largely unplanned growth of the premium mobile content industry has led both to the above-described structure and to a disastrous flaw within it. That flaw is an open secret within the industry, but little understood outside of it. In short, the billing and collection systems established by companies including Defendant in aid of the premium mobile content industry that enriches them are conspicuously free of any checks or safeguards to prevent erroneous and unauthorized charges from being added to customers' bills.

9.   Armed with only a cell phone number, mobile content providers such as Defendant W3i can simply provide that number, along with an amount to be charged, to a billing aggregator (such as mBlox). The aggregator, in turn, instructs the relevant cellular carrier to add the charge to the bill associated with that cell phone number. The charge will then appear on the consumer's cell phone bill, often with only minimal, cryptic identifying information.

### Defendant W3i's Role in the Scheme to Defraud

10.   Unlike transactions made using checks and credit cards, which require a signature or a highly private sixteen-digit credit card number, the only information mobile content providers such as Defendant W3i need to charge a consumer for their products is the consumer's cellular telephone number. Once a mobile content provider has a consumer's

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
3

Ex A     14

cell phone number, it can cause that consumer to be billed for services and products irrespective of whether the consumer actually agreed to purchase them.

11. Mobile content providers such as Defendant W3i can simply provide that cellular phone number, along with an amount to be charged, to a billing aggregator. The aggregator, in turn, instructs the relevant cellular carrier to add the charge to the bill associated with that number. The charge will then appear on the consumer's cell phone bill, often with only minimal, cryptic identifying information.

12. Because the protections normally present in consumer transactions—such as signatures and private credit card numbers—are absent from this process, the likelihood of false charges increases enormously. And, because a substantial part of mobile content "sales" are effected through web sites using misleading, oblique, or inadequately explained "consent" procedures, that likelihood increases by another order of magnitude. Mobile content providers such as W3i have powerful financial incentives to collect as many cell phone numbers as possible, but little incentive to ensure that the owners of those numbers have truly agreed to purchase their goods and services.

13. As it also knows, W3i routinely processes charges for mobile content that have not been authorized by the charged party.

14. As a result, W3i has for years been systematically, repeatedly and without authorization, billing consumers for purchase of products and services not agreed to by those consumers. Defendant W3i and third-party wireless service provider partners have, on information and belief, profited significantly through this practice.

15. Defendant W3i cooperates with numerous other companies and partners in the scheme to fraud, including aggregators, copyright licensors and affiliate marketers, among others.

**Aggregator's Role in the Scheme to Defraud**

16. In order to tap into the emerging wireless content marketplace and make content services available to wireless consumers, content providers must first obtain access to

wireless carriers' mobile communications networks and frequently do so by "partnering" with aggregators—intermediary companies that offer content providers (their "content provider partners") direct access to the carriers through existing relationships. This allows content providers to focus on developing and marketing branded content, applications, and programs while aggregators manage the complex carrier relationships, distribution, billing, and customer service.

17. Aggregators such as OpenMarket operate mobile transaction networks that help companies develop, deliver, and bill for mobile content services to compatible mobile devices throughout the State of California and the nation.

18. By using their end-to-end technology platforms, their relationships with U.S. carriers, and other value-added services, these aggregators have forged a crucial link between wireless carriers and mobile content providers. They have enabled the transformation of wireless technology into a marketing, content delivery, and collections process, while carving out a profitable role for themselves as very critical middlemen in this rapidly growing industry.

19. Aggregators have developed a vast distribution system that integrates into the wireless networks of some of the largest wireless carriers nationwide, providing direct connections to hundreds of mobile operators.

20. While aggregators charge their content provider customers some upfront fees, their revenue is primarily generated through a "revenue share" on transactions for which they bill cell phone subscribers: each time a charge is incurred in connection with the purchase of mobile content services, the aggregator and/or the content provider cause said charge to be billed directly on the cellular telephone bill of the carrier's customer who currently owns and/or uses the telephone number (claimed to be) associated with said purchase.

21. The carrier then bills and collects the charge from their current subscriber, retains a portion of the proceeds as their "revenue share," and remits the balance to the aggregator who has direct access to their network and who retains a percentage of the

1 balance in the form of their own "revenue share." The aggregator then remits the remainder
2 directly to the mobile content provider (or, in some instances, to another aggregator who
3 retains a percentage of the balance in the form of their own "revenue share" and remits the
4 balance to their mobile content provider client).

5  22. Aggregators have in the United States registered numerous transactions and processed significant amounts of money in transactions over recent years and have profited greatly from their arrangement with their industry partners.

### Copyright Licensor's Role in the Scheme to Defraud

23. Since the advent of customized cellular telephone ringers, the demand for mobile content based on copyrighted music has grown exponentially and today accounts for a significant percentage of all mobile content providers' revenue, including Defendant. In order to tap into such demand, mobile content providers must first obtain permission from the copyright owners of the music that is to be sold in the form of ringtones.

24. Owners of copyrighted music, such as Universal Music Group, Inc., Warner Music Group, Inc., and/or Sony BMG, among many others, have licensed parts of their libraries of copyrighted music to numerous mobile content providers including Defendant for the latter to sell to consumers in the form of ringtones. This arrangement allows Defendant to focus on developing and marketing content, applications and programs based on the copyrighted music while allowing the copyright owners to remain silent partners operating primarily in the background.

25. While copyright owners are ordinarily compensated by their content provider partners such as Defendant through upfront fees, their revenue is frequently generated through a "revenue share" or "equity share" based on mobile content transactions involving their copyrighted material: each time a charge is incurred in connection with the purchase of their copyrighted mobile content, the content provider causes that charge to be billed directly on the cellular telephone bill of the carrier's customer who currently owns and/or uses the telephone number (claimed to be) associated with said purchase.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
6

Ex A         17

26. Licensors have, in California and throughout the nation, registered numerous transactions and processed significant amounts of money over recent years, profiting greatly from its arrangements with its industry partners.

27. Licensors have not only sanctioned illegal billing, they have actively promoted it by negotiating and facilitating partnerships between themselves and mobile-content providers such as Defendant, and by failing to maintain adequate safeguards to prevent unauthorized charges. Despite their knowledge of such illegal practices and lack of reliable safeguards, Licensors continue to collect revenue for the sale of unauthorized mobile content.

### Affiliate Marketer's Role in the Scheme to Defraud

28. Affiliate marketers are internet advertising networks that provide a distribution platform for mobile content providers' products and services. As a cooperating business with its mobile content operations, W3i also provides affiliate marketing services to other mobile content providers.

29. Advertising is an essential step in the mobile content ecosystem. Without the ability to drive users to their websites, mobile content providers such as W3i would be unable to earn virtually any revenue, no matter how misleading or fraudulent their services. Absent advertising through these so-called affiliate marketers, the other fraudulent mobile content providers would have significantly fewer visitors to their websites and their illegal revenues would drop dramatically.

30. Many affiliate marketers with whom mobile content providers contract, including Defendant W3i, fail to clearly and accurately disclose a host of highly relevant information to consumers about purchasing mobile content, such as the service's price, subscription period and cancellation procedures, among others.

31. Indeed, many affiliate marketers specifically employ anti-consumer practices simply to achieve the next "sale," including so-called "negative options" which involves the practice of presenting a consumer with an opportunity to consent in advance to continue to

1 receive products or services in the future until cancelled. In such situations the seller frequently interprets the consumer's silence or failure to take an affirmative action to reject goods or services, or to cancel the sales agreement, as an agreement to continue to receive the offer, when in fact the consumer intends just the opposite. Moreover, one of the mobile content industry's largest affiliate marketers, Epic Advertising, Inc. f/k/a Azoogleads US, Inc. ("Azoogle"), recently settled claims brought against it by the Office of the Attorney General of the State of Florida for deceptively marketing mobile content through a negative option rubric.

32. Defendant and other affiliate marketers are loathe to adequately disclose the relevant information about purchasing mobile content for fear of scaring off potential customers. W3i has systematically declined to require those with whom it contracts to obtain consumers' true advance consent before causing such consumers to be billed.

33. Indeed, if Defendant wanted to end this illegal billing, they could do so in an instant. All it would have to do to ensure that they are obtaining the consent of the charged party is agree to process a unique "access code" for each customer account, provided by the carrier to the account holder and her/her authorized representatives at the time it is opened, and require that it be produced anytime a third-party attempts to charge the account. If a matching access code is not provided, no charges would be included on the customer's billing statement.

34. But, instead of implementing such a simple safeguard, Defendant has intentionally created, maintained and promoted a system that encourages fraud at every step. Such a system constitutes a deliberate and willful scheme to cheat large numbers of people out of small amounts of money.

### Carrier's Role in the Scheme to Defraud

35. Carriers are telephone corporations and public utilities as defined in California Pub. Util. Code sections 216 and 234.

36. Carriers use uniform form contracts ("Service Agreements") under which customers purchase cell phone services.

37. As described above, a carrier's services include providing access to and billing for various third-party mobile content services by third-party vendors such as Defendant.

38. Envisioning the potential for abuse, the California Legislature adopted California Public Utilities Code section 2890 which provides, in relevant part, that: "(a) A telephone bill may only contain charges for products or services, the purchase of which the subscriber has authorized."

39. Public Utilities Code section 2890 was intended to deter the unlawful practice of "cramming," i.e., the placing of unauthorized charges on telephone bills, as defined in the Legislative History of Public Utilities Code sections 2889.9 and 2890:

> This bill addresses the problem of 'cramming,' a practice in which consumers are charged for unauthorized services in their phone bills. [¶] ... [¶] A relatively new, and growing, scam on telephone customers is the imposition of charges on the telephone bill for products or services the customer has not bought.... [¶] Often the charges which are 'crammed' on the customer's bill are relatively small, less than $10, and inconspicuously labeled. If one does not carefully scrutinize the telephone bill, the crammed charge could easily be overlooked."]; Sen. Bill No. 378, approved by Governor, Sept. 30, 1998 (Amend.Aug.21, 1998) (1997 1998 Reg. Sess.) [" 'Cramming' charges are usually comprised of services such as unauthorized voice mail options, Internet access options, calling cards, paging services, and 800 numbers. In many cases[,] these unauthorized charges are initiated from sweepstakes, raffles, and telemarketers of unknown and unscrupulous companies."].)

Assem. Bill No. 2142, 3d reading May 7, 1998, Assem. Floor (1997 1998 Reg. Sess.).

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
9

Ex A

20

40. According to the CPUC, "the practice of cramming has become a serious and widespread problem in California, draining time and money from California consumers and businesses."

41. Revised General Order 168, "Market Rules to Empower Telecommunications Consumers and to Prevent Fraud" similarly provides that "Telephone companies may bill subscribers only for authorized charges."

42. Further, the duty of good faith and fair dealing, a part of every contract, requires that carriers not bill any customer for any good or service not authorized by the customer.

43. Upon execution of said Service Agreements and activation of cellular telephone accounts, a wireless carrier typically provides customers with a ten-digit cellular telephone number.

44. As explained above, unbeknownst to its customers, carriers frequently charge consumers for services that were never authorized.

45. The Carrier's conduct is by no means accidental. As previously alleged, it knows that many of its cellular telephone customers dispute the mobile content provider's claim that such customer consented to be charged for their mobile content services. The carriers further know that they cannot authenticate such customer's authority to be billed for such mobile content charges. In light of their knowledge of these facts, the carriers' decision to continue to charge its customers for mobile content without taking steps to authenticate the representations of the mobile content providers that the customer's authority to be charged was obtained constitutes a deliberate and willful scheme to cheat large numbers of people out of small amounts of money.

46. Because the amount Defendant is taking is small on an individual basis—as little as a few dollars to at most several hundreds of dollars per person—and because of their vast resources and superior bargaining power, Defendant employs this scheme with the hope and expectation that its illegal conduct will go unpunished.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
10

Ex A

21

## THE FACTS RELATING TO NAMED PLAINTIFF

47. In or about 2006, Plaintiff acquired new cell phone service for her family's personal use from an authorized sales representative of an established wireless carrier.

48. On that same day, in exchange for a cellular telephone service plan, Plaintiff agreed to pay her carrier a set fee for a period of several months.

49. Beginning in or about 2008, Plaintiff's cell phone account was charged by Defendant for unwanted mobile content services.

50. At no time did Plaintiff authorize the purchase of these products and services offered by Defendant.

51. During the relevant time period, Defendant caused Plaintiff to be charged service fees in the amount of several dollars for such mobile content charges.

52. At no time did Plaintiff authorize Defendant or anyone else to bill her for these charges and at no time did Defendant verify Plaintiff's purported authorization of these charges.

53. Defendant has yet to provide a full refund of the unauthorized charges consisting of the premium text message charges, ordinary text messages, data charges, back interest, implement adequate procedures to ensure that such unauthorized charges would not appear in future billing periods and/or an assurance that such unauthorized charges would not appear in future billing periods.

## CLASS ALLEGATIONS

54. Plaintiff brings this action, pursuant to Code of Civil Procedure § 382 on behalf of herself and a class, defined as follows:

    A. The Class: all wireless telephone subscribers in the state of California who suffered losses or damages as a result of W3i billing for mobile content products and services not authorized by the subscriber; provided, however, that the following are excluded from this proposed Class: (i) the Defendant, and (ii) any employee of the Defendant.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
11

Ex A

22

55. The Class consists of thousands of individuals and other entities, making joinder impractical, in satisfaction of Code of Civil Procedure § 382.

56. The claims of Plaintiff are typical of the claims of all of the other members of the Class.

57. Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and have the financial resources to do so. Neither Plaintiff nor her counsel has any interest adverse to those of the other members of the Class.

58. Absent a class action, most members of the Class would find the cost of litigating their claims to be prohibitive, and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

59. Defendant has acted and failed to act on grounds generally applicable to the Plaintiff and the other members of the Class, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class.

60. The factual and legal bases of Defendant's liability to Plaintiff and to the other members of the Class are the same, resulting in injury to the Plaintiff and to all of the other members of the Class. Plaintiff and the other members of the Class have all suffered harm and damages as a result of Defendant's unlawful and wrongful conduct.

61. There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class.

62. Common questions for the W3i Class include but are not limited to the following:

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

12

(a) Whether W3i's conduct described herein violates California Business and Professions Code sections 17200, et seq.

(b) Whether W3i's conduct described herein violates California Consumer Legal Remedies Act ("CLRA").

(c) Whether W3i has unjustly received money belonging to Plaintiff and the Class and whether under principles of equity and good conscience, W3i should not be permitted to retain it.

(d) Whether W3i tortiously interfered with contracts between Plaintiff and the respective Class, on the one hand, and their wireless carriers, on the other hand, by causing them to be charged for products and services by their carriers that were unauthorized.

## FIRST CAUSE OF ACTION

### (Violation of the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1770)

63. Plaintiff incorporates by reference the foregoing allegations.

64. The mobile content services that are the subject of this complaint are services for other than a commercial or business use, as described in Cal. Civ. Code § 1761(b). The mobile content services are used for personal, family, or household purposes, and mobile content service subscribers are consumers under the definition in Cal. Civ. Code § 1761(d). Plaintiff and the other class members use the wireless services acquired from wireless carriers for personal, family, or household purposes, and are consumers under the definition in Cal. Civ. Code § 1761(d).

65. W3i misrepresents the approval for, characteristics of, and the obligations associated with the mobile content services when they transmit billing instructions to aggregators and carriers for mobile content services to Plaintiff and the other class members which indicate that Plaintiff and the other class members have consented to the mobile content services and approved the charges for those services. These bills cause the Plaintiff

Ex A

24

1 and the other class members to pay charges for mobile content services to which they did not
2 consent, and violate Cal. Civ. Code § 1770(a)(2), (5), (14).
3     66. Collectively, these CLRA violations have damaged the Plaintiff and other
4 class members by causing them to pay falsely inflated cellular service bills to their carriers as
5 well as the lost time required to sort, read, discard and attempt to prevent future charges for
6 unwanted mobile content services, and lost storage space, connectivity, and computing
7 resources on their cellular phones.
8     67. Plaintiff, on her own behalf and behalf of the other members of the Class,
9 seeks an order enjoining Defendant's CLRA violations alleged herein, restitution of property
10 gained by the CLRA violations, and court costs and attorney's fees under the CLRA (Cal.
11 Civ. Code § 1780(d)).

## SECOND CAUSE OF ACTION

### (Violation of California's Unfair Competition Law ("UCL"),
### Cal. Bus. & Prof. Code § 17200)

15     68. Plaintiff incorporates by reference the foregoing allegations.
16     69. Defendant W3i's communications to third parties such as carriers falsely state
17 that Plaintiff and the other class members have approved, authorized, and/or consented to
18 charges for mobile content services, and are deceptive and unfair. Further, Defendant's
19 communications are unlawful because they violate the CLRA, CFAA, and/or the FCA.
20     70. The acts alleged above are unlawful, unfair or fraudulent business acts or
21 practices and constitute unfair competition under Cal. Bus. & Prof. Code § 17200.
22     71. Plaintiff, on her own behalf and behalf of the other class members, seeks an
23 order enjoining Defendant's unfair competition alleged herein, and restitution of property
24 gained by such unfair competition under the UCL (Cal. Bus. & Prof. Code § 17203), as well
25 as interest and attorney's fees and costs pursuant to, in part, Cal. Code Civ. Proc. § 1021.5.

## THIRD CAUSE OF ACTION

### (Restitution/Unjust Enrichment)

Ex A

25